UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CATRYINA BROWN,

    Plaintiff,

v.

MICHIGAN STATE UNIVERSITY BOARD
OF TRUSTEES,

    Defendant.

_____/

Case No. 1:15-cv-1280

HON. JANET T. NEFF

## OPINION

Plaintiff Catryina Brown brings this action against Defendant Michigan State University Board of Trustees ("MSU"), claiming race and sex discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., as amended by the Civil Rights Act of 1991 ("Title VII"), and under the Elliot-Larsen Civil Rights Act ("ELCRA"), Mich. Comp. Laws § 37.2101 et seq. Before the Court is Defendant's motion for summary judgment. (ECF No. 21.) Plaintiff has filed a response to the motion, and Defendant has filed a reply. For the reasons that follow, Defendant's motion will be granted.

**I.**

Rule 56 of the Federal Rules of Civil Procedure requires the Court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In evaluating a motion for summary judgment the Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "[T]he district court must construe the evidence and draw all reasonable

inferences in favor of the nonmoving party." *Martin v. Cincinnati Gas & Elec. Co.*, 561 F.3d 439, 443 (6th Cir. 2009). When such a motion is filed by the defendant, the "plaintiff must do more than rely merely on the allegations of her pleadings or identify a 'metaphysical doubt' or hypothetical 'plausibility' based on a lack of evidence; [a plaintiff] is obliged to come forward with 'specific facts,' based on 'discovery and disclosure materials on file, and any affidavits[.]'" *Chappell v. City of Cleveland*, 585 F.3d 901, 912 (6th Cir. 2009) (quoting Fed. R. Civ. P. 56(c)); *Matsushita*, 475 U.S. at 586-87). The proper inquiry is whether the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *see generally Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476-80 (6th Cir. 1989).

## II.

Plaintiff attended Michigan State University from 2003 to 2010, during which time she was a student custodian for the university's Infrastructure, Planning and Facilities ("IPF") unit. In August 2011, Defendant hired Plaintiff as a non-student, on-call custodial employee. In January 2012, Plaintiff became a Temporary Custodian I, which is a three-month position that is renewable for up to nine months. Like other temporary employees, a Temporary Custodian is evaluated at the end of every three months. At the end of the nine-month period, the temporary employee is off work for a week while they are reevaluated. (Fox-Elster Dep. 11, ECF No. 22-6.) Defendant then decides whether to continue the employment for another nine-months as a temporary employee. If the employee's reviews are satisfactory, the temporary employee can apply for a permanent position, if one is available. (*Id.* at 12-13.)

The Custodian I position requires a "casual knowledge of cleaning methods, techniques and equipment." (ECF No. 22-7.) The employee is required to perform "cleaning and housekeeping

activities" in an assigned area. (*Id.*) During Plaintiff's first year of non-student employment, from August 2011 to October 2012, Plaintiff was assigned to work in buildings that followed the "OS1" cleaning system. According to Brandon Baswell, the Custodial Services Manager for the IPF unit, the OS1 system uses a "job card protocol" that "is very specific and detailed in terms of cleaning chemicals, estimated time for each job, and workflow." (Baswell Aff. ¶ 3, ECF No. 21-3.) It is "designed to ensure consistency and equity in work flow[.]" (*Id.* at ¶ 6.) Because the university was in the process of adopting the OS1 system in 2012, not all of its buildings used it. After October 2012, Plaintiff worked in buildings that did not use the OS1 cleaning system.

A performance evaluation of Plaintiff from August 2012 shows that she fell below expectations in "quantity of work," and "attitude and cooperation." (ECF No. 21-8.) Plaintiff's supervisor from that time period told Baswell that the results of this evaluation were due to Plaintiff's failure to follow the OS1 process in a timely manner. (Baswell Dep. 15, ECF No. 21-7.) In contrast, Plaintiff's performance evaluations from October 2012, February 2013, May 2013, and February 2014, show that she met or exceeded expectations in all categories. (ECF Nos. 22-8, 22-9, 22-10, 22-11.) However, most of these evaluations were based on Plaintiff's performance in buildings that did not use the OS1 system.

In July 2014, Plaintiff obtained a permanent position as a Custodian I, assigned to work in the Administration Building, which uses the OS1 cleaning system. Per Defendant's contract with the union, Plaintiff's position was subject to a probationary period of 6 months or 1040 hours. At the beginning of this period, Plaintiff complained about the OS1 system and the job cards. (Pl.'s Dep. 83, ECF No. 21-1.) She determined that other employees "figured out a way that made more sense than going by the job cards[.]" (*Id.* at 84.) For instance, she used a cleaning agent that was

3

different from the one approved by the job card, because that is what another employee told her to do. (*Id.* at 78.) She complained to her supervisor that others were not following the job cards. (*Id.* at 88.)

Several months later, in September 2014, the only other full-time custodial employee in the Administrative Building became injured, so Plaintiff took over as the building head. "The building head is not a supervisor, but is in a position of authority in that they provide oversight with respect to the daily workflow and answer questions for other staff." (Ex. 14 to Pl.'s Resp., ECF No. 22-15, PageID.469.) At the time, Sean Fox-Elster was a Service Manager for Defendant; one of his responsibilities was to determine how much staffing was needed for custodial work at various buildings on campus. (Fox-Elster Dep. 14, ECF No. 21-5.) He was also responsible for making any necessary changes to the OS1 job cards. (*Id.*)

In December 2014, Fox-Elster went to the Administration Building to meet with Plaintiff because her supervisor notified him of some concerns that she had raised about the job cards. (*Id.* at 22, 25.) At the meeting, Plaintiff told Fox-Elster that another employee had complained that there was too much work assigned on the job cards. (Pl.'s Dep. 90, ECF No. 21-1.) Plaintiff believed that some of the cards were "wrong" and "confusing." (*Id.* at 91.) She told Fox-Elster that she had been trained to use different cards that were created by another employee, and Plaintiff followed those other cards. (*Id.* at 91, 93, 95.) She tried to persuade Fox-Elster that his job cards were insufficient. (*Id.* at 95.) But he advised her to follow his cards before they would discuss making changes to them. (Fox-Elster Dep. 19, 23; Pl.'s Dep. 94.) On one occasion, after Plaintiff argued with management and custodial staff about the job cards, she left work in the middle of her shift. (Pl.'s Dep. 96.)

Plaintiff's probationary period was set to expire in January 2015. On January 28, 2015, Defendant offered her an extension of that period. Plaintiff indicated that she was not interested in extending her probation. (Pl.'s Dep. 96.) She was told that the alternative would be termination; nevertheless, she refused to extend her probation. (*Id.*) Defendant subsequently terminated her, effective February 3, 2015.

## III.

### A. Discrimination

Plaintiff claims that Defendant terminated her on account of her race and gender. Under Title VII, it is unlawful for an employer to discharge an employee because of the employee's race or sex. 42 U.S.C. § 2000e-2(a)(1). The ELCRA prohibits similar conduct. Mich. Comp. Laws § 37.2202(1)(a). Plaintiff may prove discrimination by direct evidence, or by indirect evidence under the burden-shifting framework of *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973) and *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981). *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (noting that the *McDonnell Douglas/Burdine* framework applies to claims under Title VII); *see also Hazle v. Ford Motor Co.*, 628 N.W.2d 515, 520-21 (Mich. 2001) (applying the *McDonnell Douglas/Burdine* framework to a claim under the ELCRA).

**1. Direct Evidence**

Direct evidence of discrimination is "that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering–Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999). Generally, "[d]irect evidence of discrimination occurs when either the decision-maker or an employee who influenced the decision-maker made discriminatory comments related to the

employment action in question." *Siemer v. Comet N. Am.*, 467 F. Supp. 2d 781, 787 (S.D. Ohio 2006). Plaintiff has not offered direct evidence of discrimination. Consequently, she must establish a *prima facie* case under the burden-shifting framework of *McDonnell Douglas*.

**2. Indirect Evidence**

To establish a *prima facie* case of discrimination using indirect evidence, Plaintiff must produce evidence showing that "(1) [she] is a member of a protected class; (2) [she] was qualified for [her] job; (3) [she] suffered an adverse employment decision; and (4) [she] was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008); *see also Lytle v. Malady*, 579 N.W.2d 906, 914 & n.19 (Mich. 1998) (describing the fourth part of the *prima facie* case under the ELCRA as requiring the plaintiff to show that she "was discharged under circumstances that give rise to an inference of unlawful discrimination," but explaining that "[t]his four part test is an adaptation of the United States Supreme Court's *McDonnell Douglas* test to prove a prima facie case of discrimination"). "Once the plaintiff establishes this *prima facie* case, the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action." *Id.* If the defendant meets this burden, "the burden shifts back to the plaintiff to show that the defendant's proffered reason was not its true reason, but merely a pretext for discrimination." *Id.* at 391-92. "A plaintiff will usually demonstrate pretext by showing that the employer's stated reason for the adverse employment action either (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action." *Id.* at 393.

   (a) <u>Member of a Protected Class</u>

Defendant does not dispute that Plaintiff is a member of a protected class.

   (b) <u>Qualified for the Job</u>

Defendant claims that Plaintiff was not qualified for her position because she was unable to meet expectations when she was asked to follow the OS1 protocol. However, this argument improperly conflates two stages of the *McDonnell Douglas* inquiry. Plaintiff's poor performance was one of Defendant's asserted reasons for taking the action that it did, but "a court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the *prima facie* case. To do so would bypass the burden-shifting analysis and deprive the plaintiff of the opportunity to show that the nondiscriminatory reason was in actuality a pretext designed to mask discrimination." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 574 (6th Cir. 2003). Consequently, "when assessing whether a plaintiff has met her employer's legitimate expectations at the prima facie stage of a termination case, a court must examine plaintiff's evidence independent of the nondiscriminatory reason 'produced' by the defense as its reason for terminating plaintiff." *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660-61 (6th Cir. 2000). "At the prima facie stage, a court should focus on a plaintiff's *objective* qualifications to determine whether he or she is qualified for the relevant job." *Wexler*, 317 F.3d at 575.

> The prima facie burden of showing that a plaintiff is qualified can . . . be met by presenting credible evidence that his or her qualifications are at least equivalent to the minimum objective criteria required for employment in the relevant field. Although the specific qualifications will vary depending on the job in question, the inquiry should focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills.

*Id.* at 575-76.

In this case, Plaintiff's work experience and performance evaluations show that she was

qualified to perform a job requiring "casual knowledge of cleaning methods, techniques and equipment." (ECF No. 22-7.) In addition, there is no genuine dispute that she was able to perform "[f]requent lifting of up to 25 pounds" and "occasional lifting of 50 pounds." (*Id.*) These were the minimum objective qualifications for a Custodian I position. Thus, it appears that Plaintiff was qualified for her job.

### (c) Adverse Action

Defendant argues that it did not take an adverse action against Plaintiff because her termination was the result of her decision not to accept an extension of her probation period. According to Defendant, Plaintiff could have accepted this extension and there would have been no material change in the conditions of her employment. The extension would have had no impact on Plaintiff's work assignment or her compensation and benefits.

Defendant's argument presents a close question to which Plaintiff has not offered a response. *See Amos v. McNairy Cnty.*, 622 F. App'x 529, 534 n.3 (6th Cir. 2015) (noting that "placement on a performance improvement plan and non-satisfactory work reviews, absent some loss in salary, title, or benefits, [do] not rise to the level of a materially adverse employment action," but that "this Circuit has not explicitly addressed whether probation is an adverse employment action in the context of discrimination[.]"). However, the Court need not resolve this issue because Plaintiff's claims fail for other reasons.

### (d) Disparate Treatment

To establish her *prima facie* case, Plaintiff must also show that she was treated differently from a similarly-situated employee of a different race or gender.

> Employees may be considered similarly situated if a plaintiff can prove that all of the relevant aspects of his employment situation are nearly identical to those of the

8

> employees who he alleges were treated more favorably. [*Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994)]. This means that "the individuals with whom the plaintiff seeks to compare his treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct." *Mitchell*, 964 F.2d at 583. Differences in job title and responsibilities, experience, and disciplinary history may establish that two employees are not similarly situated.

*Cambell v. Hamilton Cnty.*, 23 F. App'x 318, 325 (6th Cir. 2001). To satisfy this test, Plaintiff points to Defendant's treatment of Dan Isaacson. Isaacson was a white, male custodial employee who worked on the same crew as Plaintiff. He had the same supervisor and was subject to the same probationary period. Plaintiff claims that Isaacson engaged in the same conduct but was not given any discipline. According to Plaintiff, Isaacson also failed to follow the OS1 job cards, but unlike Plaintiff, he passed his probationary period.

Plaintiff's contention that Isaacson did not follow the job cards is not supported by any evidence. Plaintiff relies on an email written by Fox-Elster to Baswell, in which Fox-Elster reports on his conversation with Plaintiff in December 2014; Fox-Elster states, "It seems the crew at Administration has not been following the job cards the way they should." (ECF No. 22-22.) According to Plaintiff, this statement shows that Isaacson also failed to follow the job cards because he was also part of the "crew" at the Administration building. However, Fox-Elster was merely referring to the crew generally. He did not refer to Isaacson in particular. Moreover, he was reporting what Plaintiff had told him. In her deposition, Plaintiff admitted that, as far as she was aware, Isaacson followed the job cards. (Pl.'s Dep. 106.) Thus, Fox-Elster's statement is not evidence that Isaacson did not follow the OS1 job cards.

9

Furthermore, there is no evidence that Isaacson had disagreements with management about the job cards or walked off the job in the middle of his shift, as Plaintiff did. (*See id.* at 107.) Thus, Plaintiff and Isaacson did not engage in the same relevant conduct and were not similarly situated.

"[W]hile a discriminatory inference is *usually*, and perhaps most readily, generated through evidence of unfavorable treatment of the minority plaintiff vis-à-vis similarly-situated individuals, *McDonnell Douglas* and its progeny do not require this *always* be the case . . . ." *Lindsay v. Yates*, 578 F.3d 407, 417 (6th Cir. 2009). "The central inquiry in evaluating whether the plaintiff has met [her] initial burden is whether the circumstantial evidence presented is sufficient to create an inference [of discrimination]." *Id.* at 269. This initial burden "is not onerous." *Burdine*, 450 U.S. at 253. "[S]o long as 'additional evidence' exists—beyond showing the first three elements of the *McDonnell Douglas* test—that indicates discriminatory intent in 'light of common experience,' the required 'inference of discrimination' can be made in satisfaction of the *prima facie* case." *Lindsay*, 578 F.3d at 418. In this case, there is no additional evidence of discriminatory intent. Thus, Plaintiff has not offered sufficient evidence to create a reasonable inference of discrimination.

(e) <u>Reason for Defendant's Actions</u>

Even assuming Plaintiff had offered sufficient evidence to establish a *prima facie* case, her claims would fail because Defendant has offered legitimate reasons for its conduct, and there is no evidence that these reasons are a pretext. Once a plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the employer to produce a legitimate, nondiscriminatory reason for its employment decision. Defendant claims that it offered to extend Plaintiff's probation because she was insubordinate and undependable. (Baswell Aff. ¶ 7, ECF No. 21-3.) These are legitimate, nondiscriminatory reasons for Defendant's decision.

(f) <u>Pretext</u>

Plaintiff claims that she can establish that Defendant's purported reasons are untrue, but she provides no evidence to support this assertion. Plaintiff admitted in her deposition that she complained about the job cards, that she followed job cards other than the ones approved by Fox-Elster, and that she left work in the middle of her shift after a disagreement with management. These actions were adequate for Defendant to find that Plaintiff was insubordinate and undependable, and were a sufficient reason for Defendant to extend Plaintiff's probation. Plaintiff also argues that she can show pretext because Isaacson passed his probation, but as discussed above, Isaacson did not engage in the same conduct as Plaintiff. There is no evidence that he failed to follow the job cards or complained to management about them. Thus, Plaintiff has not shown that Defendant's reasons are untrue.

**IV.**

For the reasons discussed herein, there is no evidence that Plaintiff was treated differently from a similarly-situated employee. Thus, she has not met her burden of providing evidence that would permit an inference of discrimination. Consequently, Defendant's motion for summary judgment will be granted and judgment will be entered in favor of Defendant.

An order and judgment consistent with this opinion will be entered.


Dated: <u>March 2, 2017</u>           <u>  /s/ Janet T. Neff                </u>
                                    JANET T. NEFF
                                    UNITED STATES DISTRICT JUDGE